Nottingham's Adm'r

*v.*

Lynchburg Trust & Savings Bank *et al.*

(*Supreme Court of Appeals of Virginia, March 17, 1898.*)

[29 S. E. Rep. 684.]

**Estate of Decedent—Claims against—Improperly Allowed—Case at Bar.**

Defendant's decedent gave four notes to the assignor of claimant's testator, two of which were subsequently delivered to claimant's testator, in pursuance of a general assignment of the payee. The remaining two notes were renewed by other like notes, without being taken up, and the new notes were thereupon discounted to plaintiffs. After the death of the payee, the note in controversy, being one of the notes so renewed, was found by claimant among the effects of the deceased payee, and claimed as the property of his testator, by virtue of such assignment: *held*, improperly allowed as a claim against th estate of defendant's decedent.

Appeal from law and equity court of city of Norfolk.

Separate actions by the Lynchburg Trust & Savings Bank and another against William A. Wren, administrator with the will annexed of Thomas J. Nottingham, deceased, and others, consolidated, in which a certain claim of James D. Tate, executor of the will of M. B. Tate, deceased, against the estate of said Nottingham, deceased, was in controversy. To a report allowing said claim, said administrator excepted, and from a decree establishing it as a debt he appeals. Reversed.

*Walke & Old,* for appellant.

*Starke & Starke, John H. Lewis,* and *White & Garnett,* for appellees.

RIELY, J., delivered the opinion of the court.

The single question involved in the appeal is whether or not the note of Thomas J. Nottingham to W. H. Wren for $1,500, dated July 3, 1891, claimed in the petition of James D. Tate, the personal representative of M. B. Tate, deceased, is a valid debt.

Both Nottingham and Wren are dead, and this controversy was started after their death. There is no direct personal testimony as to the status of the note, and its validity is to be mainly determined from the letters of Wren and Nottingham, and from circumstances.

W. H. Wren bought in his own name, for himself and associates, the Mt. Athos property for $25,000, upon the terms of $5,000 cash and the residue in two equal installments, at 6 and 12 months from January 1, 1891, with interest from that date.

T. J. Nottingham agreed to take one-fifth interest in the property, with the understanding, however, that it was not then convenient for him to make the cash payment, but that he would give his note therefor, with his Glasgow stock as collateral security. He executed his note to Wren for the cash payment of $1,000 and attached the stock to it; but Wren, ascertaining shortly thereafter that it was necessary to incur certain preliminary expenses in carrying out the purposes of his associates and himself with reference to the property, of which Nottingham's part was estimated to be $500, thereupon returned to Nottingham his note for $1,000, and inclosed a note for $1,500, payable at 4 months from January 1, 1891, which the latter signed and returned to Wren on February 10, 1891.

Nottingham, on February 27, 1891, just as he was starting for Europe on a protracted tour, sent to Wren his two notes, for $2,000 each, for the deferred payments, and also a note for $1,500 to renew the note for that amount already given for the cash payment and for his part of the preliminary expenses, in case there should be need for it while he was abroad. The two

notes for $2,000 each bore date January 1, 1891, and were payable, with interest from that date at 6 and 12 months respectively.

On June 30, 1891, Wren wrote to Nottingham that he was never able to get discounted the note for $1,500, with the Glasgow stock as collateral security, and had been obliged, in order to meet the cash payment due from Nottingham and his part of the preliminary expenses, to use his note for $2,000, given for the first deferred payment ; that this note would be due July 3d ; that he had arranged to renew it for $1,500 ; and inclosed a note for this purpose to be signed and returned immediately.

Nottingham arrived at his home in Norfolk, on his return from his trip abroad, on July 1, 1891, and on July 2, 1891, executed and returned to Wren the note for $1,500, to be used in renewing the note for $2,000 ; he (Wren) agreeing to pay the curtail and discount.

The record shows that Wren wrote to Nottingham on July 3, 1891, and inclosed other notes for him to sign, which were executed and returned to him by Nottingham on July 6, 1891. The administrator of Nottingham was never able to find the letter of Wren of July 3, 1891, but the subsequent correspondence shows very clearly that the notes inclosed in it by Wren to Nottingham, and which were returned by Nottingham to Wren in his letter of July 6, 1891, were, one for $1,500, and the other for $500, with an additional amount for certain interest that had accrued. These two notes were evidently intended to take up or replace the note for $2,000, given by Nottingham for the first deferred payment, and which Wren had had discounted to meet the cash payment of Nottingham and his proportion of the preliminary expenses, and were so used by Wren.

Nottingham's proportion of the preliminary expenses, instead of being $500, as at first estimated, turned out to be $1,000 ;

thus making the aggregate cost of his one-fifth interest in the property, and of his part of the expenses, $6,000 principal.

The two notes, for $2,000 each, given by Nottingham for the deferred payments, were proved and allowed against his estate ; their aggregate amount, however, being reduced by a resale of the Mt. Athos property, and the amount due on them settled at $3,000.

The two notes sent by Nottingham to Wren on July 6, 1891, to replace the note for $2,000, which fell due on July 3, 1891, were also proved and allowed. The four notes, thus proved and allowed, aggregated the sum of $6,084.37, which is the full amount for Nottingham's purchase of a one-fifth interest in the Mt. Athos property, and of his part of the preliminary expenses, inclusive of interest.

It is very clear, from the evidence, that there existed no other indebtedness from Nottingham to Wren, except that which arose out of the Mt. Athos transaction, and the entire amount thereby incurred has been allowed against his estate.

A careful consideration of the evidence leaves no room for rational doubt that the controverted note for $1,500, dated July 3, 1891, and payable four months after date, which is claimed by James D. Tate, personal representative of M. B. Tate, deceased, is the note sent by Nottingham to Wren on July 2, 1891, in response to the letter of the latter of June 30, 1891. It may be that Wren sent, in his letter of July 3, 1891, to Nottingham, the notes which were executed and returned by the latter on July 6, 1891, because he did not hear from Nottingham in reply to his letter of June 30th as promptly as he had expected, or because he found out that he could not pay the curtail on the note for $2,000, and had to arrange it in some other way ; but, whatever the cause, it satisfactorily appears that those two notes were used to take up or replace the note for $2,000, and that the note for $1,500 sent to Wren by Nottingham on July 2, 1891, never became a debt in the hands of Wren. This conclusion is confirmed by the conduct of Wren. His subsequent letters disclose a most urgent need of money,

and the most active demand for the payment of the other notes ; but throughout his entire correspondence there is no demand whatever for the payment of the controverted note, nor an allusion to it as an existing debt.

On December 24,1891, he conveyed and assigned to M. B. Tate his real and personal estate, and particularly embraced in the conveyance and assignment "all notes and other evidences of indebtedness of his associates in the purchase of the Mt. Athos estate." He turned over to M. B. Tate, in pursuance of the assignment, the two notes, of $2,000 each, given for the deferred payments ; but the two notes, of $1,500 and $584.37, which went to replace the note of $2,000 which was given for the first deferred payment, were in the hands of the Lynchburg Trust & Savings Bank and the Krise Banking Company, respectively, which have since proved them against the estate of Nottingham, and could not be turned over by Wren to Tate. If the note in dispute was a subsisting debt, he should have delivered it to Tate, in pursuance of the assignment, along with the two notes, for $2,000 each ; and there is not the suggestion of a reason why he should have withheld it. His failure to do so can only be accounted for upon the theory, which is sustained by the evidence, that the other notes referred to were used to accomplish the purpose for which it was executed. It is obvious, from the circumstances under which the note was found, that Wren did not regard it as of any value. After his death in a distant state, his trunks, containing his personal effects and papers, were sent to James D. Tate, the petitioner, who, in looking through his papers, old pocketbooks, etc., found it in an old pocketbook in one of the trunks.

We are of opinion that the exception taken by the administrator of Nottingham to the report of Commissioner Smith allowing the note as a debt against his estate should have been sustained. The decree of the court below establishing it as a debt must therefore be reversed, and the claim disallowed.

Cardwell, J., absent.